The final matter today, number 22-1356, Carlos M. Rivera-Velazquez v. Michael S. Regan. At this time, would counsel to the appellant please introduce themselves on the record to begin. Good morning. Maricarmen Analova-Villegas for the court of appeals for Carlos M. Rivera-Velazquez. We will rest for two minutes before we move on with the case. We ask the court to review the record, the number one, and to reverse and amend this case to the jury. In this case, we're going to focus, there are several issues, but we're going to focus the oral argument on one and rely on our brief for the other arguments. And the issue is whether Carlos M. Rivera-Velazquez was perceived or regarded as a person with a mental impairment after his return from combat in Afghanistan by his supervisors at the employment that he had held for more than 12 years. Like in every summary judgment proceeding, the district court has the duty to review the evidence as a whole. What's the best fact for you that suggests the jury could, on this record, find that he was so perceived? Because there are two sets of facts. One, what will be considered by the court in the summary judgment, which was how Rivera perceived his supervisors perceived him on his return to the army. The second set of facts are how the supervisors, the record that shows how the supervisors perceived him after his return from war. The problem in this case is that the district court partly acknowledged how Rivera perceived his supervisors upon his return from war, but totally ignored all the evidence that reflected the statements made by the supervisors about Rivera's behavior after his return from war, making specific references to the fact that he had been in Afghanistan. What are those pieces of the record? I'm going to read from the record. That's when, in March 2015, the investigator from the OIG, who was called by or requested by the deputy director of the CEPD in Puerto Rico to investigate Rivera to determine whether he had committed fraud regarding the certification of his credentials. An investigator came to Puerto Rico in March and interviewed several employees, among which were, of course, Mr. Rivera's supervisors. The first supervisor, Teresita Rodriguez, who had been Rivera's supervisor for a long time. The record shows that Teresita Rodriguez, within the context of a credential investigation, said to the investigator, Rivera's personality changed after his return from Afghanistan. That's at page 11.4. And how does that suffice to show he was regarded? It's a totality of the evidence. And then, Nancy Rodriguez, who became Rivera's supervisor in January 2014. A supervisor that Rivera testified that from the outset, from her beginning, her detail, did not hold eye contact with her, failed to meet with him, refused to meet with him alone, would communicate your comments non-verbally. Your comments are coming from a person that shouldn't be taken seriously. Nancy Rodriguez tells the investigator, Rivera was offensive, aggressive. He would get so upset. He would get so loud. Is there a fact that indicates that any of those perceptions, as they communicated them, rested on their perception that he had a disability? With the totality of the evidence, yes. Okay, well, what is the piece that would show that? Well, he said, she said, it's compassionate of him that he would get like this, and she would think, what would happen? Yeah, but is there anything that indicates that they thought he was behaving that way because of the disability? Well, they didn't say it's because he's disabled. She did say, I don't know how he was before Afghanistan. I've been told that he was cooperative. But he's been like this since I began here at CV. There was a reference somewhere in the record, too. Yes. To a record about PTSD diagnosis. Well, there is. He was diagnosed in 2012. They allege they didn't know about the PTSD diagnosis until 2014. And is there anything in the record that shows otherwise? No. Okay. But the issue is that regarded as disabled, even more after the 2008 Congress amendment of the definition of disability, to make it broader, to encompass more people, that's why regarded as is so important. You don't need to prove that the other person knows your diagnosis. No, but you have to prove that they think you are. Of course. But that's where the jury comes from. The jury comes with their common sense. So are you saying that the necessary inference, because of the referral, of the references to Afghanistan, means that they implicitly thought that he was disabled? Yes. Because of his service and in the back of their minds, suffering from a mental disorder. Yes, that he was a time-kicking bomb, Your Honor. Because if it was only Nancy Rodriguez who did not know him from before, but Teresita Rodriguez had known him before and after Afghanistan, and it was her, precisely her, who made the point of saying that his personality changed after the war. But one could have a personality change after that without having a disabling condition, so how could you, in a non-speculative way, deduce that they were attributing the personality change not only to the experience of the war, but to a condition that qualifies as a disability? Well, why would a supervisor mention a personality change in the context of a credential investigation, together with the comments that Nancy Rodriguez made about how he was behaving? And another issue is that... Let me see if I can just pin down where I think that we just are trying to get at. Does a personality change equate to someone thinking that you're suffering from a mental condition? No. So what is the evidence that something other than he saw the ravages of war came back, perhaps altered, but not necessarily impaired? Yes. Well, because she refused to meet with him alone. Because she engaged with every manager to check on her when he was meeting with her. Why was she threatened by him? If it was just a personality issue that caused problems in the workplace, that personality was being disrespectful. Thank you. And may I finish? Yes. And there is not one admonishment, there is not one disciplinary procedure, and a jury, using their common sense, using their life experiences, could reasonably conclude that they didn't acknowledge Rivera, they didn't disagree with Rivera because they knew that the behavior was a reflection of an underlying mental condition. Thank you. Thank you. Thank you, counsel. At this time, if counsel for the appellee would please introduce themselves on the record to begin. Good afternoon. Good afternoon. Please support Denise Rodriguez, counsel for Appellee Michael Riggins, secretary of the Environmental Protection Agency. Your honors, we request that you affirm the judgment of the district court granted for the judgment. Because as we will explain, the record is correct. Any evidence that raises a genuine dispute is a material fact. The material fact being here has already been discussed. The lack of any evidence that there was any discriminatory animus against the plaintiff in this case has been clearly discussed. The court's ruling was basically the most important part of the ruling is that the plaintiff in this case was incapable of proving that he was disabled under the statute. That all the claims were based on a regarded-as basis. In this particular situation, going into that failure to prove it, we want the court to recognize that the district court did a clear and expansive factual finding, and it evaluated the record closely, and in that evaluation found that there was no evidence of being regarded as disabled. If my cousins want to ask about this part, they can, but could I just have you address the retaliation ruling on the retaliation claim? In the retaliation claim, is there an argument that there was retaliation based on the referral to the OIG? Okay. With regards to that, we will start first by saying that, just like in the other cases, the plaintiff fails to prove that he's disabled, so that would require a granting or a concession that he's disabled for the retaliation. No, it wouldn't. Well, because he would have to show that it was based on… Protected conduct. …the protected conduct. The protected conduct can be engaged by somebody who's not disabled or not even regarded as disabled. But… And he did engage in protected conduct. The district court doesn't even dispute that. He engaged in protected conduct when he complained. Yeah. The OIG would not be deemed retaliation because it does not raise to the level of meeting a standard of being an adverse enforcement action. And that's… Yeah, go ahead. Let me put it this way. Is there a way we could affirm in this case without accepting that proposition? Because I've got to tell you, the standard for adverse action under retaliation, as you know, under the Burlington North case, is not up. And the supervisor's referral to an OIG office, the term Inspector General, for potential civil or even potential criminal liability sure sounds like the kind of thing that might reasonably discourage an employee from engaging in protected activity with certain rights. So are there narrower grounds for referring under retaliation? Well, we would start by saying that it is not an adverse enforcement action because if we look at the referral itself, which is of October 1st, 2014, there is no nexus between the protected action, which would have been in 2011. There's no nexus. So we've got a three-year delay and a causation. I understand that. Okay. That's a very different claim from saying referring an employee to an OIG investigation is not adverse. Well, the other thing is that a careful examination of the referral form itself, which the court did, shows that the referral itself is not in the nature of repetitive action. The analysis and the fact-finding in this case is that the OIG investigation is referred because it all arises out of a third-party claiming that the inspection conducted by a plaintiff in this case was being conducted by an inspector that did not have proper credentials. So a third-party breach is an outside party impeaching the credentials of the plaintiff in this case to conduct the enforcement action that raises all of this issue. And in evaluating his credentials and the credentials of the other members of the branch division that is being evaluated, they find that there are deficiencies in the credentialing effort of multiple enforcers. So for that reason, it becomes an investigation into the credentialing in the branch, not of the plaintiff himself. Yes. Can you direct this, by any chance, in the record to some policy regarding how such outside complaints have to be handled? Lots of people complain about judges' decisions, and they rarely rise to serious attention or disciplinary matters so that they can disagree. In this kind of incident, what was it about that complaint that led to the investigation that included the plaintiff and included the scope? For suit to the records and the findings of the court in the order, it was raised by legal counsel in the Talagua case enforcement action. Legal counsel for the Caribbean Enforcement Unit here at the EPA raised the question as to the credentials and asked for the credentials of the enforcers in this case, which happened to be the plaintiff. And it was pursuant to that that they raised the issue of looking at what the credentials were, and somebody outside the division made a determination that the credentials were insufficient. Was there any indication that the counsel who made the referral had been aware of Plaintiff's protective activities from several years ago? There is no indication on the record, discussion of the development of the record, that he would have been aware of the complaint filed in 2011. And if Hector Redesi was the legal counsel of the division, there's nothing developed as to his participation either in any type of discriminatory action against Plaintiff either. So he would not have been a decision-maker or a person that would have had a capacity to do any type of retaliation for that. What does the record show about the plaintiff's awareness that the OIG investigation was initiated? Well, one of the things is that the record shows that the letter was issued. The questions about the credentials were raised in August of 2014. The referral to the OIG was made in October of 2014. It is not until sometime in May of 2015 when the OIG is conducting the investigation and comes to Puerto Rico and interviews multiple individuals at the local office that the plaintiff becomes aware of the investigation. And the language itself of the referral is a language that requests that there be a review of the credentialing. It's not a referral for investigation regarding the defendant. And the document itself also determines that there's multiple officers who have deficiencies in the credentials. Which all goes to the linkage between it and the protected conduct. But this is not a case in which there was an internal investigation initiated and it's like a tree that falls in the forest. The plaintiff had no awareness of it. The plaintiff didn't know about it. The plaintiff did not know about it? He did know about it during the proceeding of the investigation as he was interviewed. He did find out, but a year after the referral was made. So it would have been in 2015. But he found out about it as part of an interview where I think six or seven individuals in the office were interviewed. He wasn't the sole individual interviewed. And the fallout from the investigation was that there found deficiencies. Just the reason I'm asking is that I thought the district court opinion that was relied on by the district court as something about an internal investigation that wouldn't cause embarrassment. But it's hard to see how an internal investigation like this wouldn't cause embarrassment if it was connected, if the precipitating event was the protected conduct. I understand you're saying there's no basis for saying that. Well, and the thing about it is that it wasn't targeted to the plaintiff. At the end of the day, the investigation opened up and looked at the credentialing of all of the enforcement officers in the branch, in the whole office. So by the time in 2015 that the plaintiff becomes aware of the investigation going on, it's an investigation that's looking at multiple individuals at the facility. So it's not the type of investigation that was retaliatory against the plaintiff himself. So he wasn't aware. So it's not the type of retaliation that would keep somebody from complaining. Thank you. Can I turn your attention to your motion to strike against Two questions. One is there seem to be some criticism about the timing of that, which I don't understand. I assume it would not be prepared until it was needed, which is in responding to the motion of summary judgment. Maybe I'm overlooking something. Second, subsequently, at least the discussion on all sides, and by the district judge, about potential contradictions between the plaintiff's deposition testimony and the affidavit, was all that discussion was in general terms. Are there specific parts of his affidavit that you found most troubling and most specifically contradicted by the deposition testimony? Starting with the timing question. With the rest of the timing, this just goes through the process of that any denial of any statement of fact in the motion for summary judgment should be supported by the record. And the sham affidavit, or the affidavit in this case in particular, one of the most, and the court indicates, if I may answer your question, it's devoid of any supporting reference to anybody, like the whole affidavit itself. It has not a single reference to the record. Well, the plaintiff is allowed to testify about his own experience. He would, but what happens is that not only is it the board of records, it has opinion, conclusive allegations, devoid of any support to the record, which violates rule 56 and the concept. If you're going to deny any statement, you have to support it. So it doesn't do it at all. That doesn't tell me about the timing. Well, and the timing itself is important because it raises, and the court goes into, there's four areas the court indicates it's ruling on. They're matters that are not otherwise addressed in the discovery record, and that's why it violates the sham affidavit rule so correctly, because he's bringing issues that were not otherwise developed in discovery. The issues being, for example, allegations that he himself was divested of duties under AHERA due to delegation to the Environmental Quality Board. It's not an issue that was addressed before, but that was part of the Statement of Uncompensated Material Facts. The second issue was an issue about a co-worker, Jonah Orte, being the only person qualified for a GS-13 position that was applied for after he filed his EO complaint in 2020. That's a new matter completely separate in this case. I understand raising new matters, but that doesn't tell me about why the timing is suspicious. The timing is suspicious because it is an attempt, which is the purpose of the sham affidavit rule. It's trying to create material issues of fact to quote to the jury. That's what you do when you oppose the motion of your sample judgment. Let's forget about the timing. Substantively, what is most troubling to you? In that respect, it also brought up the issue of Alex Rivera trying to bring a disparate treatment theory of claim, which had not been addressed before the complaint. It wasn't part of what was being... You don't have to identify comparators in the complaint. Can you repeat that? There is no need to identify a comparator when you file your complaint in a disparate issue. You don't, but it would have been brought up during discovery. It's just something that was not addressed in any of the discovery materials. And all of these things are... The important thing about timing is that all of these issues are being brought up after the closing of discovery, after anybody can develop any information to address what are your complaints. The other thing is that none of these issues appear either on the original EEO complaints of 2017 and 2018, which are the documents that create the parameters of your complaint and pursuant to which the complaint is filed or the discovery has been completed, based on the extensive questionnaire that was filled out by the plaintiff in 2017 and 2018 when you filed these EEO complaints. All of these materials were devoid, did not reference that original complaint. And I think that that's why the court makes the finding that it's new evidence trying to create new issues to survive summary judgment that do not warrant a thing. But one of the important things about it, if I can finish, is that the court was very careful in how it treated the Shacklin Fidega. Despite striking the whole Fidega, the court also made the finding that it only impacted 13 out of the 343 statements of uncontested material fact that the plaintiff filed in their additional statement of uncontested material facts. The court specifically went and struck those 13 issues, which only addressed the four areas that I discussed, which is the disparate treatments. Thank you. Thank you, counsel. Counsel for the appellant will please reintroduce herself on the record. She has a two-minute rebuttal. First, the OID investigation. They're referring back to 2011, three years before the EEO that he filed in 2011. After that, when he returned, he engaged in protected conduct. He complained about Nancy Rodriguez's lack of qualifications. He complained about harassment to Teresita Rodriguez. He complained... What did they do with respect to the OID investigation after that? No, no, that was before the OID investigation, because we argued about the temporal proximity between the protected conduct, the complaints to her supervisor. When is the first protected conduct? What year was the first protected conduct? That was in 2014. For this particular period of time, 2014. And when did the OID investigation begin? He was referred to the OID in October 1st. And the credential issue of 2014? 2014. The original issue of the credentials was notified in August 2014. And Rivera fought the issue of the credentials fiercely, because he understood that they were wrong, in stating that he was... I'm just not understanding the timing. I thought the OID... What began in 2011? No, no, that was an EEO that he presented while he was still in the war. He had applied to a position, he was interviewed... So the protected conduct that you're talking about here precedes the OID investigation? The OID investigation, exactly. And then, what the record shows, Your Honor... And what is the timing, proximity-wise, then? One month, two months.  to show that anybody other than José Font referred Rodríguez Rivera to the OID. And is the... And that person who referred him, is that the general counsel? No. That's the deputy director of the CEPD. And who would have been aware of the complaint? Of course. Yeah, of course. And not only that, but if the court reviews the documents that refer to... that the defendant produced referring to the communications regarding the OID investigation, there is not one document where it states that anybody in Region 2 other than José Font participated in the actual referral to the OID. Moreover, among these documents, there is a memorandum written by Teresita Rodríguez on behalf of José Font to Richard Mana. They were just requesting his feedback about the editing of the referral. And one of the things that he said was... You have one more. Okay. Let me finish it. And that they wanted the OID to determine whether Rivera had knownly committed fraud regarding the credentials. There is no document, there is no evidence, that any other employee whose credentials were being questioned was referred to the OID before charges, three of which entail imprisonment of David Brewer Wright. Correct. Okay. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.